Filed 7/22/14  In re W.T. CA2/

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re W.T., A Person Coming Under the Juvenile Court Law. | B251894 |
| | (Los Angeles County Super. Ct. No. CK14505) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| BRENDA J., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed in part, reversed in part, and remanded.

Maryann Milcetic Goode, under appointment by the Court of Appeal, for Defendant and Appellant Brenda J.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

Brenda J. ("Mother") appeals from the juvenile court's jurisdiction and disposition orders declaring her daughter, W.T., a dependent of the court pursuant to Welfare and Institutions Code[1] section 300, subdivision (b), and removing the child from Mother's care and custody. Mother argues that the evidence was insufficient to support the jurisdictional finding that W.T. was at a substantial risk of physical harm as a result of Mother's mental health issues. She also asserts that the juvenile court erred in removing W.T. from her custody and ordering the child suitably placed in foster care. We affirm the jurisdiction order, but reverse the disposition order and remand the matter to the juvenile court to conduct a new disposition hearing for W.T.

### FACTUAL AND PROCEDURAL BACKGROUND

**I.      Prior Child Welfare History**

W.T. (born November 1999) is the daughter of Mother and Marvin B. ("Father").[2] Between 2004 and 2012, the family was the subject of numerous child welfare referrals, which were deemed unfounded or inconclusive. The only substantiated referral occurred in September 2007 and was based on an allegation that Mother physically abused one of her foster children. In connection with that referral, the Department of Children and Family Services ("DCFS") filed a section 300 petition on behalf of W.T., alleging that Mother had physically abused an unrelated foster child by repeatedly striking his body with a stick and belt buckle, and that such conduct placed W.T. at substantial risk of harm. In November 2007, the juvenile court dismissed the petition without prejudice and the case was closed under a plan of informal supervision.[3]

---

[1]      Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

[2]      Father is not a party to this appeal.

[3]      At the DCFS's request, we take judicial notice of the juvenile court's November 1, 2007 minute order in the prior dependency case. (Evid. Code § 452, subd. (d).)

2

## II.  Initiation of the Current Dependency Proceedings

The current matter came to the attention of the DCFS on May 2, 2013, when it received a referral alleging that then 13-year-old W.T. was the victim of emotional abuse. The referral specifically alleged that, in December 2012, Father beat Mother in the presence of W.T., his girlfriend burned the child's clothes, and the couple vandalized Mother's home.  The referral further alleged that, in April 2013, W.T.'s maternal uncle physically assaulted Mother in the child's presence, and on May 1, 2013, Father fought with Mother on a street and attempted to take W.T.  In addition, the referral alleged that Mother resided in an apartment without furniture or utilities, was bipolar, and was a danger to herself.  The caller stated that Mother truly cared for W.T., but had no support system and was in great need of services.

On May 3, 2013, the case social worker interviewed W.T. at her school.  Although W.T. seemed to have a somewhat low affect, she told the case social worker that she was doing okay and she appeared to be in good physical health.  W.T. stated that she did not fear either Mother or Father, but that Mother was extremely fearful of Father because he had attacked her in the past.  W.T. did not believe Father knew their current whereabouts, but noted that he "somehow always finds out where we are staying."  When asked about the allegation that Father had fought Mother on the street and tried to take W.T. two days earlier, the child responded that she was "a little too big for the kidnapping scene," and "nothing like that had happened."  She disclosed, however, that in March 2013, Father assaulted Mother on the street after he saw them in a public location.  She also confirmed that, in December 2012, Father beat Mother and his girlfriend burned W.T.'s clothes in a bathtub, and in April 2013, her maternal uncle attacked Mother.  The child was aware of long-term domestic violence between her parents, but indicated that it usually occurred outside her presence and that there had been no recent incidents inside the home.

With respect to Mother's mental health issues, W.T. reported that Mother went to the doctor, talked to a counselor, and took medication,  As described by W.T., Mother always had been an emotional person and "will cry about little things, but then she will be okay again and smiling."  When asked if Mother was crying continuously or isolating

3

herself, the child replied, "[N]o she['s] good . . . that's just my mom. You don't know my mom, but my whole family knows how she is, that's just how she is . . . she's okay though." W.T. denied that Mother had ever attempted to hurt herself or anyone else, and explained that Mother's crying "doesn't last, but two seconds." W.T. also said she felt safe in her home. The case social worker noted that W.T. was protective of Mother and appeared to normalize Mother's mental health issues and the family's domestic violence.

The case social worker also spoke with W.T.'s academic counselor, who did not have any concerns about the child's immediate safety in her home. The counselor stated that W.T. was "like any child of a parent with mental health" issues, who "just gets used to doing things more on her own." She also reported that if W.T. got Mother "riled up about something at the school, her mom will come down here and yell at [the counselor] or a teacher." The counselor provided the case social worker with W.T.'s grades, which consisted of four "F's", one "D", and three "C's."

That same day, the case social worker interviewed Mother at her home. The home was clean and appeared to provide for the minimum standard of living. Mother said that the home had electricity and running water, but the gas was going to be turned off soon because she did not have enough money to pay for it due to Father stealing money from her. Mother acknowledged that she had been involved in ongoing domestic violence with Father and the maternal uncle, including an incident two days earlier where Father attacked her in front of W.T.'s school. She reported that she had obtained restraining orders against Father and his girlfriend, and was seeking one against her brother. Mother admitted that she had a previous dependency case and a related criminal conviction for injuring a child, but claimed the prior case arose because she caught her foster child masturbating over then six-year-old W.T. Mother accused the DCFS of trying to take W.T. from her so that the child "can wind up in some foster home."

Mother disclosed that she had been diagnosed with bipolar disorder one year earlier and also had been treated for an eating disorder. She denied being a danger to herself or others, and said that if she had "bad thoughts," she called her therapist at Alcott Mental Health Center. Mother also stated that she had been taking her prescribed

4

medications, Trazodone and Sertraline, consistently for the last six months, but she did not like some of the side effects, which caused her to feel hot, tired, and thirsty. Mother paced around the apartment throughout the interview while attempting to clean and organize the home. When asked how she thought her emotional instability and domestic violence affected W.T., Mother explained that she took good care of her child and ensured she was safe, but also noted that W.T. had nightmares and Mother wanted to enroll her in therapy. The case social worker observed that Mother's emotions oscillated throughout the interview from being tearful and depressed to calm and compliant.

At one point in the interview, Mother admitted to the case social worker that she had threatened suicide within the past month. On that occasion, the maternal uncle came to take W.T. to Father. Mother did not want W.T. to leave her home because Father and his family previously had abducted the child. Mother grabbed a kitchen knife and told W.T. that she would kill herself if the child left. Mother quickly realized her mistake, apologized to W.T., and explained to the child that she was "just having 'an episode.'" Mother and W.T. then hugged and cried together. Mother indicated that she planned to continue with treatment at Alcott Mental Health Center the following week. Although Mother initially told the case social worker that she was willing to authorize the release of information relating to her treatment, she later refused sign the release.

The case social worker also interviewed Mother's adult daughter, I.J., who stated that Mother was "not crazy," but "trie[d] to tell people that she [was] crazy." I.J. reported that Mother did have mental health issues that caused trouble for I.J. when she was a teenager, but she refused to elaborate because she wanted to maintain a relationship with Mother. I.J. also indicated that Mother had been ostracized by her family and was "always trying to do things to get attention." I.J. did not believe that Mother would ever intentionally hurt W.T., and she was not concerned about W.T.'s safety because the child could always stay with her. I.J. said that Father lived Georgia where he had been for a long time.

On May 3, 2013, the DCFS received an additional referral alleging that W.T. had written a six-page letter in which she stated that there was no electricity or water in the

home and at times no food, that Mother disappeared for days and slept all day due to depression, and that Mother had threatened her with a knife. The letter also allegedly stated that W.T. was temporarily living with Father, who got drunk, bullied W.T., and did not take her to school.

On May 6, 2013, the case social worker had a telephone conversation with Mother in which she said that she had "survived the white people's bullshit," and that she and her daughter would "work this out alone." Mother indicated that she previously had been hospitalized against her will for telling a social worker that she was suicidal, but she would not disclose when this occurred. Mother seemed paranoid at times, stating that her therapist had given her medication "to get money from the big companies so that she can drive her Mercedes," and that she was "going to stay away from the Alcott Center to get the help [she] need[ed]." Mother explained that she was "extremely depressed and manic" during the last interview and may have overmedicated herself. That same day, the case social worker met with Mother at her home. Mother sat in bed during the visit and tearfully said, "I need help, but you all aren't going to help me." Mother was also accusatory throughout the visit and refused to answer any questions about her treatment. However, she did admit that she had not taken her prescribed medication for the past three days because she was experiencing negative side effects. Later that afternoon, Mother left a voicemail message for the supervising social worker in which she acknowledged being "bipolar" and "crazy," but stated that she did not need an "egocentric white woman coming into [her] house and not hearing [her]." She said that she was "extremely depressed and going through a lot," but she did not have any intent to harm herself or anyone else. She also said that she needed someone to help empower her, not to take her child away, and she asked the DCFS to leave her alone.

On May 7, 2013, the case social worker contacted the dean at W.T.'s school, who stated that he regularly interacted with Mother when she came to the school and that he did not have any concerns about W.T.'s safety in the home. He knew Mother had mental health problems and believed she was experiencing some paranoia. He also was aware that Mother had obtained a restraining order against Father. However, he was not aware

6

of any altercations between Mother and Father in front of the school, and said that the school police would have alerted him if there had been any such incident.

On May 8, 2013, the case social worker interviewed W.T. about the allegations in the second referral. W.T. denied writing the letter referenced in the referral, and insisted that Mother did not sleep all day or leave her alone for long periods of time. The child stated that Mother was "completely sane" and was on medication "when all that stuff happened at the house." She believed that Mother took her medication on a daily basis because Mother would get hot and drink water all day. With respect to Mother's threat of suicide, W.T. related that she and Mother were arguing about whether she would be graduating from the eighth grade, and W.T. told Mother that she was leaving with the maternal uncle. Mother responded by grabbing a knife and telling W.T., "I'm going to kill myself if you leave." W.T. did not believe the threat because Mother had never tried to hurt herself in the past, and the child was able to leave with her uncle after the incident.

The case social worker also spoke with Mother's therapist at Alcott Mental Health Center. The therapist, however, could not provide the DCFS with any information regarding Mother because Mother did not want to sign a medical release. Mother also had told the facility, "[Y]ou may not speak to those people."

On May 9, 2013, the case social worker contacted Father by telephone. Father stated that he lived in Georgia and had not lived in southern California for 19 years. He said that he had not heard from W.T. for approximately two years, but a week ago, she sent him a Facebook message asking how he was doing. Father described Mother as a "habitual liar" and accused her of falsely telling W.T. that Father was an alcoholic and a drug addict. Father also said that Mother has always been bipolar with "constant, erratic mood swings." He indicated that he was concerned about W.T. because of Mother's lies and mental health issues, and that he would be willing to work with the DCFS to address the child's needs. However, when the case social worker subsequently attempted to contact Father, his telephone number was no longer in service.

On May 13, 2013, the juvenile court denied, without prejudice, the DCFS's request for a removal order. That same day, Mother left a voicemail message for the case

social worker, informing her that she and W.T. were homeless because she had not been able to pay her rent. W.T. was staying with her maternal aunt so she could continue to attend her school while Mother stayed with a friend. Mother also related that she was continuing to receive treatment at Alcott Mental Health Center and would call back later that week. In subsequent telephone conversations with the case social worker, Mother accused Father of lying about not being in California, and maintained that he came to Los Angeles in early May and attacked her on the street. She also stated that she currently was on a "better cocktail" of medications with side effects that were not as extreme.

On May 23, 2013, the case social worker called Mother and informed her that the DCFS would be recommending that the juvenile court remove W.T. from her custody. Mother stated that she would not be attending the scheduled hearing because she did not believe the DCFS should be able to take her child away and place her somewhere that she could be abused. Mother acknowledged that her medication was not helping her and that she may have been overmedicated, but said that she was doing better. She maintained that Father and his girlfriend had physically assaulted her in the past, and that her brother had come to her home and tried to take W.T. away. Mother also said that she was doing her best to care for her child and that she felt she was being unfairly treated by the DCFS.

## III. Section 300 Petition

On May 24, 2013, the DCFS filed a section 300 petition on behalf of W.T., alleging that Mother had mental and emotional problems which rendered her unable to provide W.T. with regular care and placed the child at substantial risk of physical harm. At the May 24, 2013 detention hearing, neither Mother or Father appeared. Counsel for the DCFS advised the court that Mother was adamant she would not make W.T. available to be detained. W.T.'s appointed counsel reported that she had spoken with Mother, who indicated she was unaware of the hearing and that W.T. was graduating that day. The juvenile court ordered that W.T. be detained from parental custody and placed in shelter care. The court stated that it would issue a protective custody warrant for W.T. and give Mother another chance to appear with the child before issuing an arrest warrant for her.

8

On May 30, 2013, Mother appeared in court without W.T. and was appointed counsel. The protective custody warrant previously issued for W.T. remained in effect, but was later recalled when the child was detained at her school. The jurisdiction and disposition hearing was set for June 26, 2013.

## IV.    Jurisdiction/Disposition Report

In the Jurisdiction/Disposition Report filed on June 19, 2013, the DCFS noted that W.T. had been placed in foster care. The dependency investigator interviewed the child on June 6, 2013 about the allegations in the petition. According to W.T., she had been told that she was removed from Mother's care because Mother was "not healthy in the head." She was aware that Mother was bipolar and took medication to help her sleep, but said that Mother only slept at night and kept herself busy during the day. As described by W.T., Mother "never seemed sad. The only thing is she would cry a lot but she would be able to stop really fast. She would cry over things like a commercial or her missing her father." W.T. stated that she and Mother were very close and told each other everything. She also reported that Mother took good care of her, did not yell at her, and disciplined her by taking away privileges or lecturing her. W.T. described Father as an abusive alcoholic who was violent toward Mother. W.T. insisted that Father still came to California and that she saw him assault Mother in front of her school. The last time W.T. saw Father was in March 2013 when he tried to take her from Mother while they were near her grandmother's house. With respect to Mother's suicide threat, W.T. recounted that she and Mother had been arguing about how her hair should be styled for her graduation. When W.T. told Mother that she was leaving with her maternal uncle, Mother held a knife to her arm and threatened to kill herself. W.T. said that she was never scared because she knew Mother would not hurt herself. She also said that she felt safe with Mother and that Mother was her best friend.

On June 10, 2013, the dependency investigator spoke with Mother over the telephone. Mother said that she had told her therapist that she wanted to kill Father, but she did not know the therapist "was going to report it." Mother also stated, "I never took

any of the medication. I hadn't even been going to a therapist. My mother didn't believe in mental health treatment. So, I don't understand why this is happening. I even asked the psychiatrist . . . to give me a physical exam because I felt hot [all] over my body. I felt like I was going through menopause. I was going through so much." Mother still refused to sign a release of information regarding her mental health treatment.

The dependency investigator had difficulty contacting other family members, but was able to speak with W.T.'s maternal aunt, Alma H., who stated that she did not want to see Mother or W.T., or to have any involvement in the case. Alma reported that she had allowed W.T. to stay in her home for a period of time, but Mother became upset because Alma did not want to care for the child permanently. Alma said that Mother "had the nerve to go off on [her] the other day because of this," and that Mother "was going crazy." She also said that no one in her family talked to Mother, and refused to provide contact information for any other maternal relatives.

The report noted that Mother had a monitored visit with W.T. on June 10, 2013 and was appropriate during the visit. Father, on the other hand, had not had any contact with the child or the DCFS. Although the dependency investigator made repeated attempts to reach Father, his telephone number continued to be out of service.

In a supplemental report filed on June 26, 2013, the dependency investigator stated that she had interviewed Mother at the DCFS office on June 10, 2013. At the start of the interview, Mother informed the investigator that she had never taken her prescribed psychotropic medication and that she did not intend to take it. Mother brought various bottles of herbs and vitamins to the interview, and reported that she took 14 different herbs and vitamins to "stay balanced." Mother also explained that she went to Alcott Mental Health Center because she was feeling overwhelmed due to two recent deaths in her family and efforts by Father and her brother to obtain her social security number so that Father could claim her on his income taxes. According to Mother, the staff at Alcott Mental Health Center prescribed her medication at her first visit without conducting a physical exam. They simply asked her "a bunch of stupid questions" and then gave her some pills. They also told Mother that she was bipolar, which she had known since she

10

was 12 years old. Mother said that, after researching the negative side effects of the prescribed medications online, she informed her psychiatrist that she was not going to take the medications and intended to continue with her herbal regimen. When the psychiatrist advised Mother that she had to get the "right cocktail," Mother responded in frustration by stating that she wanted to kill Father because he was trying to obtain her and W.T.'s social security numbers. Mother said that Alcott Mental Health Center then began sending the police to her home every Friday, even though she assured the facility that she was not trying to kill herself.

During the interview, Mother also told the dependency investigator, "Yes, I did try to stab my brother because he was trying to get my social security card and give it to [Father]. Plus he was choking and threatening me. He was also trying to push me over the balcony." Mother maintained that Father frequently came to California, and typically stayed from December to February. Mother said that, although she knew it was wrong, she kept W.T. out of school for two weeks when Father was in town last winter because she feared that he would take the child from school. Mother also said that Father had attacked her in front of W.T.'s school in February 2013, but the child was not present at the time and had never personally witnessed any other incidents of domestic violence between the parents. Mother claimed that W.T. had not seen Father since she was two years old, but occasionally communicated with him through Facebook.

Mother denied ever being psychiatrically hospitalized. She also denied that she had threatened to kill herself. As described by Mother, she had an argument with W.T. over her hair and told the child not to leave home with her uncle. She also told W.T. that the uncle had pulled a knife on her in the past and that Mother had no choice but to stab him. When W.T. decided to leave with her uncle anyway, Mother "just closed the door and shook it off." Mother stated that she did not intend to continue her treatment at Alcott Mental Health Center and that she already had an intake appointment with the Department of Mental Health. She indicated that she was willing to get help, but she was not willing to take medication. She also did not believe she needed parenting classes because she had attended classes two years ago as part of another dependency case.

11

Mother explained that the prior case arose because she used to be a foster mother and found one of her foster children engaging in oral sex with W.T.

The DCFS recommended that W.T. be declared a dependent of the juvenile court and remain suitably placed in foster care. The agency further recommended that both Mother and Father be granted family reunification services. With respect to Mother, the DCFS noted that she appeared to be in need of intensive mental health services. The agency also stated that, while it understood Mother's concerns about the potential side effects of her prescribed medications, it seemed that Mother's preferred method of treatment had not helped to stabilize her mental health.

## V.       Jurisdiction and Disposition Hearings

### A.       June 26, 2013 Hearing

On June 26, 2013, the juvenile court held the jurisdiction and disposition hearing. Both Mother and W.T. were present. The DCFS's reports were received into evidence, and all counsel stipulated that if Mother were to testify, she would state that she did not have bipolar disorder and had never been diagnosed with that condition. No other evidence was offered by the parties. The juvenile court sustained the petition as amended and declared W.T. a dependent of the court under section 300, subdivision (b).

The court then turned to disposition. W.T.'s counsel asked the court to return the child to Mother's care under continued supervision because W.T. "clearly wants to be with her mother and will find a way to do that." Counsel for the DCFS argued that W.T. should be suitably placed because Mother had a long history of mental health issues and was not compliant with her medication. Mother's counsel advised the court that the prescribed medication rendered Mother unable to work. Mother interrupted her attorney and clarified that she never took the medication because she did not believe she was bipolar and her doctor had confirmed that she was simply going through menopause.

The court stated that it needed an Evidence Code section 730 evaluation to determine Mother's mental health diagnosis and medication needs, and that it appeared Mother might require more than "over-the-counter vitamins or herbal remedies." The

12

court also stated that, because a due diligence search was needed for Father, it would begin implementing services for Mother but "hold off on the [section] 361 finding." The court ordered that W.T. remain placed in foster care with unmonitored visitation for Mother while the child was in placement. Mother was ordered to participate in individual and conjoint counseling and parenting education, and to comply with her prescribed medication regimen. The court encouraged Mother to be honest during her evaluation and to inform her doctors that she needed medication that would allow her to continue to work and to take care of her child. The court ordered the USC Institute of Psychiatry and Law to perform Mother's evaluation to assess her mental health functioning, including her current diagnosis and prognosis. The court's written order directed the DCFS to provide copies of the petition and all relevant reports to the evaluator within five calendar days. The disposition hearing was continued to August 7, 2013.

## B. August 7, 2013 Hearing

In a supplemental report filed on August 7, 2013, the DCFS informed the juvenile court that Father recently had contacted the agency to inquire about W.T. In a telephone call with the dependency investigator, Father stated that he had not been in California for 20 years and had not seen W.T. since she was approximately two years old. He acknowledged speaking with the case social worker in May 2013, but said that he was not aware that W.T. was placed in protective custody. He denied that his telephone number had been disconnected. He also denied that he visited W.T. each December and said that his only communication with the child had been on Facebook. Father claimed that Mother had caused him to lose his job in the past by calling his employer. He also said that Mother had made it appear he was residing in California, and as a result, he did not feel comfortable providing the DCFS with his current employer's contact information. Father accused Mother of lying to W.T. about him, and stated that Mother's "lies have always been beyond belief and she should be in jail." Father indicated that he wanted W.T. released to him in Georgia. In its report, the DCFS noted that Mother's psychiatric

13

evaluation could not be completed because USC was no longer accepting new patients, and asked that a new facility be appointed to conduct the evaluation.

At the August 7, 2013 hearing, the juvenile court ordered an assessment of Father's home pursuant to the Interstate Compact on the Placement of Children ("ICPC") over the objection of both Mother and W.T. The court also stated that Mother was "going to be sent out for another [Evidence Code section] 730 evaluation to see what her mental medical situation is and whether or not she needs medication and is taking such medication."[4] On August 21, 2013, the court signed a written order appointing Dr. John Leonard to conduct Mother's evaluation, and directing the DCFS provide copies of the petition and all relevant reports to him within five calendar days. The disposition hearing was further continued to September 25, 2013.

### C.     September 25, 2013 Hearing

At the September 25, 2013 disposition hearing, Mother's counsel advised the juvenile court that the psychiatric evaluation previously ordered for Mother had not been performed. Mother's counsel explained that the DCFS had "just found Dr. Crespo" to conduct the evaluation, but the agency had not provided Dr. Crespo with any paperwork related to the case.[5] Mother's counsel asked the court to release W.T. to Mother and find the case social worker in contempt, or alternatively, to continue the disposition hearing until the evaluation could be completed.

The court observed that its file did not include any order directing the DCFS to provide Dr. Crespo with the reports, and thus, it could not hold the case social worker in

---

[4]     According to a notation in the juvenile court's August 7, 2013 minute order, the proposed written order for Mother's new evaluation was not submitted to the court as of the date the minute order was prepared.

[5]     The record does not reflect why the second appointed evaluator, Dr. John Leonard, was unable to conduct Mother's evaluation, or how the third evaluator, Dr. Alfredo Crespo, was selected. The record also does not contain any written order appointing Dr. Crespo to conduct Mother's evaluation prior to the September 25, 2013 hearing.

contempt for failing to do so. The court further stated: "[T]he thing about it is I've read the file, and I find there's grounds for suitable placement. We could still have the 730 and have everybody come back to walk the matter on for a change of placement if it's appropriate. But I don't have grounds for continuing this any longer. This is a filing from May 24th. It's long past the time for disposition." Mother's counsel argued that "the standard for release at that time may be different," and that it would be unfair to Mother to proceed with the disposition in the absence of an evaluation that could show that her mental health did not place W.T. at risk of harm. The court told Mother's counsel: "We've got to dispose of the case today and set the six-month date. We'll set a date certain in a week to make sure that all of the papers have been sent to Dr. Crespo. We'll set an eight-week date for the receipt of that report so everybody can get it. And then if it does have information that everybody, including you, believes there's grounds for returning the child to the mother, you can make a [section] 388 [petition]." After setting the dates for the receipt of the documents and the evaluation, the court also noted, "I'm not at all sure that . . . is going to prove that we can release to the mother, and we have to make a resolution today so we can start the services to get the child back to the mother."

The juvenile court ordered that W.T. be removed from the custody of her parents and be suitably placed by the DCFS. Mother was granted family reunification services, including individual and conjoint counseling, mental health counseling, parenting education, and monitored visitation with W.T. at least three times per week. She also was ordered to submit to the psychiatric evaluation and to take all prescribed psychotropic medication. The court granted the DCFS discretion to walk the matter on calendar for the court to consider placement with Father once an ICPC assessment was completed. W.T.'s counsel noted, however, that the child did not wish to reside with Father and "very much want[ed] to return to [her] mother." On September 30, 2013, Mother filed a notice of appeal.

15

## DISCUSSION

### I.    Jurisdiction Order

On appeal, Mother first challenges the sufficiency of the evidence supporting the juvenile court's jurisdiction order under section 300, subdivision (b). She specifically contends the evidence was insufficient to support the jurisdictional finding that W.T. was at substantial risk of serious physical harm as a result of Mother's mental health issues.

### A.    Appealability

As a preliminary matter, we address the DCFS's argument that this court may not consider Mother's challenge to the juvenile court's jurisdiction order because Mother failed to reference that order in her notice of appeal. In her notice of appeal, Mother stated that she was appealing the following findings and orders: "9/25/2013: Court's Decision to Proceed with Disposition without a 730 Evaluation Report on the Mother and the Court's Order of Suitable Placement for the Child." She also checked the boxes indicating that she was appealing orders made under "Section 360 (declaration of dependency)" and "Removal of custody from parent or guardian." Although Mother did not check the box indicating that she was seeking a "review of section 300 jurisdiction findings," she did identify the dates of "9/25/2013, 8/7/2013, [and] 6/26/2013" as the hearing dates when the appealed orders were made.

A notice of appeal must be liberally construed in favor of its sufficiency. (Cal. Rules of Court, rules 8.100(a)(2) and 8.405(a)(3); see also *In re Joshua S.* (2007) 41 Cal.4th 261, 272.) Additionally, because "'[t]he jurisdictional finding under section 300 … is interlocutory and not appealable, … any issue pertaining to it must be raised in a timely appeal of the dispositional order.'" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393, fn. 8.) Mother's notice of appeal stated that she was appealing the juvenile court's September 25, 2013 dispositional orders; however, it also specified the hearings held on September 25, 2013, August 7, 2013, *and* June 26, 2013 as the hearings where the appealed orders were made. The jurisdiction and disposition hearing originally was held on June 26, 2013, at which time W.T. was declared a dependent of the court. The

disposition hearing was thereafter continued to August 7, 2013 and then to September 25, 2013. In light of the liberality in construing notices of appeal, we construe Mother's notice of appeal as an appeal from all aspects of the jurisdiction and disposition orders.

## B. Applicable Law

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Substantial evidence is "evidence that is reasonable, credible, and of solid value." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Under this standard of review, we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the juvenile court on issues of credibility of the evidence and witnesses. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1103.) We determine only whether there is any substantial evidence, contradicted or uncontradicted, that supports the juvenile court's order, resolving all conflicts in support of its determination and drawing all reasonable inferences to uphold its ruling. (*In re John M.* (2012) 212 Cal.App.4th 1117, 1124.) If there is substantial evidence to support the juvenile court's order, we must uphold the order even if other evidence supports a contrary conclusion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

Section 300, subdivision (b) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

"The three elements for a section 300, subdivision (b) finding are: '(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.] The third element . . . effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . . [Citations.]" (*In re Savannah M.*, *supra*, 131 Cal.App.4th at pp. 1395-1396.)

17

"Although evidence of past conduct may be probative of current conditions, the court must determine 'whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' [Citations.] . . . . There must be some reason beyond mere speculation to believe the alleged conduct will recur. [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135-136.)

### C.     Jurisdictional Finding as to W.T. Under Section 300, Subdivision (b)

The juvenile court sustained count b-1 in the amended section 300 petition as follows: "The child [W.T.'s] mother, Brenda [J.] has mental and emotional problems including a diagnosis of depression, suicidal ideation, and other mental health disorders, which renders the mother unable to provide regular care of the child. In 2013, the mother was hospitalized for the evaluation and treatment of her psychiatric condition. The mother failed to take her psychotropic medication as prescribed. The mother's mental and emotional problems endanger the child's physical health and safety and place the child at risk of physical harm and damage."

Mother argues that the evidence was insufficient to support the juvenile court's finding that her mental and emotional problems posed a substantial risk of serious physical harm to W.T. at the time of the jurisdiction hearing. It is true, as Mother asserts, that the DCFS had the "'burden of showing specifically how the minor[ ] [has] been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent.'" (*In re James R.*, *supra*, 176 Cal.App.4th at p. 136; see also *In re Jamie M.* (1982) 134 Cal.App.3d 530, 542 [child welfare agency "must demonstrate with specificity *how* the minor has been or will be harmed by the parents' mental illness"].) It is also true that "[p]erceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence." (*In re James R.*, *supra*, at p. 137.) In this case, however, there was substantial evidence that Mother's persistent mental health issues and refusal to take prescribed psychotropic medication placed W.T. at risk of serious physical harm.

Although Mother made conflicting statements about her diagnosis and treatment, she admitted that she had a psychiatric condition for which she was seeking treatment

18

from mental health care professionals. She also admitted that she had been prescribed psychotropic medication, but had decided not to take the medication because she learned from online research that there were negative side effects associated with it. Instead, Mother was attempting to treat her condition with various herbs and vitamins, but by her own admission, she was continuing to experience episodes of depressive and manic behavior during the dependency proceedings. Additionally, while Mother had been participating in therapy through Alcott Mental Health Center at the start of the proceedings, she had decided to stop her treatment with that provider by the time of the jurisdiction hearing because she did not want to take the medications that the doctors had prescribed and she believed that they were sending the police to her home.

There was also evidence that Mother was experiencing paranoid delusions, which caused her to believe, among other things, that Father was stalking her and W.T., was physically abusing Mother, and was trying to take the child away from her. Mother even kept W.T. out of school for a period of time because she feared that Father would kidnap the child from her school. Mother asserts that her fear of Father was based in reality because W.T. confirmed that Father assaulted Mother on the street while attempting to kidnap her in March 2013. However, Mother's and W.T.'s statements about their level of contact with Father were inconsistent in many respects, and both Father and Mother's adult daughter, I.J., reported that Father had not lived in California for many years. On this record, the juvenile court reasonably could find that Mother's mental illness was manifesting itself in delusional behavior, and that Mother was encouraging W.T. to share in those fears and delusions.

The evidence presented at the jurisdiction hearing further established that Mother had threatened suicide in the presence of W.T. a few months before the jurisdiction hearing. Although Mother and W.T. later sought to minimize the incident, they admitted that, during an argument about the child's eighth-grade graduation, W.T. told Mother that she was leaving the home with the maternal uncle. In response, Mother grabbed a knife and threatened to kill herself if W.T. left her home. Mother notes that W.T. told the case social worker that she did not take the threat seriously because she knew that Mother

19

would never hurt herself. However, as the DCFS correctly points out, Mother's actions in grabbing a knife and threatening to kill herself in front of W.T. exposed the child to potential violence and could have resulted in a serious physical injury to W.T. if she had attempted to intervene. While Mother sought to characterize her threat as an isolated incident, she admitted to the DCFS that she previously had been hospitalized against her will after telling a social worker she was suicidal. Under these circumstances, Mother's suicidal ideation, if left untreated, posed a substantial risk of future harm to her child.

In addition, the record reflects that there was other evidence of violent behavior by Mother. In an interview with the DCFS, Mother disclosed that she had told her therapist that she wanted to kill Father, but lamented that she did not know the therapist "was going to report it." Mother further disclosed that she had tried to stab W.T.'s maternal uncle because he had assaulted Mother and attempted to steal her social security card. During the argument with W.T. that resulted in the suicide threat, Mother shared this information about the maternal uncle with the child, telling W.T. that she "just had to stab him because he pulled a knife on [her]." Mother also confirmed with the DCFS that she had a prior dependency case and a criminal conviction arising out of her physical abuse of a foster child in 2007. Although none of Mother's prior violence had been directed at W.T., it demonstrated that, without proper treatment, Mother was prone to erratic behavior and violent outbursts, which impaired her ability to provide her child with appropriate parental care.

Therefore, based on the totality of the record, the juvenile court reasonably could conclude that W.T. was at a substantial risk of serious physical harm as a result of Mother's persistent mental health problems and resistance to treatment. The juvenile court's finding that W.T. came within the jurisdiction of the court under section 300, subdivision (b) was supported by substantial evidence.

## II.    Disposition Order

On appeal, Mother also challenges the juvenile court's disposition order removing W.T. from Mother's care and custody and placing the child under the supervision of the

20

DCFS for suitable placement. Mother claims the evidence was insufficient to support a finding that W.T. would be at a substantial risk of danger if allowed to remain in Mother's home and that removal of W.T. from Mother's custody was the only reasonable means to protect the child from harm.

### A. Applicable Law

Section 361, subdivision (c) permits the removal of a child from the custody of his or her parent if the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being" of the child if he or she were returned home, and "there are no reasonable means by which the [child]'s physical health can be protected without removing" the child from the parent's custody. (§ 361, subd. (c)(1).)

"The elevated burden of proof for removal from the home at the disposition stage reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so. [Citations.] By requiring clear and convincing evidence of the risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety, section 361, subdivision (c) demonstrates the 'bias of the controlling statute is on family preservation, not removal.' [Citation.] Removal 'is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent.' [Citation.]" (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146; see also *In re Henry V.* (2004) 119 Cal.App.4th 522, 525 ["[t]he high standard of proof by which [a removal] finding must be made is an essential aspect of the presumptive, constitutional right of parents to care for their children"]; *In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288 [section 361, subdivision (c) "embodies 'an effort to shift the emphasis of the child dependency laws to maintaining children in their natural parent's homes where it was safe to do so'"].) Where the juvenile court makes a dispositional finding by the elevated standard of clear and convincing evidence, the

substantial evidence test remains the appropriate standard of review on appeal. (*In re Hailey T.*, *supra*, at p. 146; *In re Henry V.*, *supra*, at p. 529.)

### B. Disposition Order Removing W.T. from Mother's Custody

At the September 25, 2013 disposition hearing, the juvenile court found that there was clear and convincing evidence that W.T. would be at substantial risk of harm if she were returned to Mother's home, and that removal of the child from Mother's custody was the only reasonable means of protecting her from harm. The court acknowledged that the Evidence Code section 730 evaluation previously ordered for Mother still had not been performed, but noted that it was "long past the time for disposition" and that there were "grounds for suitable placement" based on the record before it. The court also stated that Mother could bring a section 388 petition to seek a change in W.T.'s placement once the evaluation was completed. Based on the totality of the record, we conclude the juvenile court erred in ordering the removal of W.T. from Mother's custody.

There was no evidence that W.T. had ever been physically or verbally abused by Mother. There was also no evidence that Mother was neglecting W.T. or had ever done so in the past. Instead, the record reflects that W.T. was closely bonded with Mother, felt safe in her home, and wanted to be returned to her care. The case social worker observed that W.T. was in good physical health and that Mother's home was clean and appeared to provide for the basic necessities of life. Although W.T. had poor grades and poor school attendance, the school's administrators did not have any concerns about the child's safety in Mother's home. Both the dean and the academic counselor were aware that Mother had mental health problems, but they did not perceive W.T. to be in any danger, and the counselor described W.T. as being "like any child of a parent with mental health" issues, who "just gets used to doing things more on their own." W.T.'s maternal relatives reported that Mother was estranged from the family as a result of her mental illness and erratic behavior, but they did not express any concern about W.T.'s safety in Mother's home. While Father told the DCFS that he had concerns about W.T. based on Mother's

lies about him and her mental health history, he also indicated that he had not seen the child since she was two years old and had only minimal contact with her.

In the face of this evidence, the juvenile court failed to consider whether there were reasonable means of protecting W.T. other than removal from Mother's custody. "[C]ourts have recognized that less drastic alternatives to removal may be available in a given case including returning a minor to parental custody under stringent conditions of supervision by the agency. . . ." (*In re Hailey T.*, *supra*, 212 Cal.App.4th at p. 148; see also *In re Henry V.*, *supra*, 119 Cal.App.4th at p. 529.) At the June 26, 2013 jurisdiction and disposition hearing, Mother expressed a willingness to submit to a psychiatric evaluation and to take any recommended psychotropic medication so long as it did not render her unable to work. At that hearing, the juvenile court stated that it believed an Evidence Code section 730 evaluation was necessary before proceeding with the disposition to determine Mother's mental health functioning and medication needs as well as the risk of harm to W.T. Through no fault of Mother's, the evaluation was not performed by the date of the continued disposition hearing on September 25, 2013. At that time, despite the absence of any new evidence, the juvenile court decided that the previously ordered evaluation was no longer needed for dispositional purposes, and that removal of W.T. from Mother's custody was necessary and appropriate. The evaluation, however, would have been helpful to the court in determining whether less restrictive alternatives to removal were available in this case.

Based on its statements at the September 25, 2013 hearing, it appears the juvenile court primarily was concerned with the long delay in completing the disposition hearing, and the need for a formal disposition to begin the reunification process. However, apart from noting that there were "grounds for suitable placement," the court did not articulate its basis for finding that there would be a substantial danger to W.T. if she were returned to Mother's custody, nor did it address whether a plan for court-ordered services and continued supervision of the family might be a reasonable alternative to removal. Instead, the court simply advised Mother that she could bring a section 388 petition seeking a change in placement if the results of the evaluation showed that W.T. could be

23

safely returned to her home.  This was not the proper standard for determining whether the DCFS had met its burden to establish the necessity for removing W.T. from Mother's care and custody in the first place, and it shifted the burden to Mother to show a change in circumstances at some future date.

Based on this record, we conclude that, while Mother's mental health issues placed W.T. at substantial risk of future harm and thus supported the exercise of jurisdiction, the juvenile court erred in failing to consider whether there were reasonable alternatives to ordering W.T.'s removal.  We accordingly reverse the disposition order and remand the matter to the juvenile court with directions to conduct a new disposition hearing for W.T.  At the new hearing, the juvenile court shall consider whether, at this stage in the dependency proceedings, there would be a substantial danger to W.T. if the child were returned to Mother's custody, and if so, whether there are alternatives that would provide a reasonable means of protecting her from the risk of harm.

## DISPOSITION

The juvenile court's jurisdiction order is affirmed.  The disposition order removing W.T. from Mother's custody and ordering her suitably placed is reversed and the matter is remanded to the juvenile court for further proceedings consistent with this opinion.


ZELON, J.


We concur:


PERLUSS, P. J.


WOODS, J.

24